**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| MR. DONALD RIGGS and CHRISTY RIGGS, | ) ) ) | |
| Plaintiffs, | ) ) | No. 2:23-cv-02780-TLP-atc |
| v. | ) ) | JURY DEMAND |
| BARTLETT, CITY OF, TENNESSEE, BENJAMIN ARMSTRONG, ZACHARY MARTIN, JOSE GOMEZ MARQUEZ, and LIEUTENANT GERALD HOLMES, | ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTIONS
AND DISMISSING CASE WITH PREJUDICE**

This case is about mental health, alleged excessive force, and corresponding liability. One evening in 2022, in the midst of a mental health crisis, Plaintiff Donald Riggs beat his head against the wall and ran, barely dressed, out of his house and into a cold December night. Worried about his safety, Mr. Rigg's wife, Christy Riggs, called 911 and asked for a paramedic. Bartlett Police officers responded instead and found Mr. Riggs wandering through a neighborhood. They asked him to stop. But he ran. The officers chased Mr. Riggs, handcuffed him, and took him to a mental health clinic. That clinic later sent him to a hospital where he was treated for certain injuries.

Mr. and Mrs. Riggs then sued the officers involved—Defendants Benjamin Armstrong, Zachary Martin, Jose Gomez-Marquez, and Lieutenant Gerald Holmes (together, "Officers")—and the City of Bartlett, Tennessee ("the City") under 42 U.S.C. § 1983 and Tennessee state law.

1

(ECF No. 1.)  Plaintiffs, the City, and the Officers all now move for summary judgment.  (ECF

Nos. 95, 109, 110.)  The Court considers these three summary judgment motions here.  And for

the reasons below, the Court **GRANTS** the Officers' Motion; **GRANTS** the City's Motion; and

**DENIES** Plaintiffs' Motion **AS MOOT**.

**BACKGROUND**

A brief word about the evidence.  Mrs. Riggs's 911 call and the Officers' dash and

bodycam footage largely capture the events here.[1]  So the Court relies on this objective evidence

to resolve factual disputes where possible.[2]  *See Scott v. Harris*, 550 U.S. 372, 380 (2007);

*Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 601 (6th Cir. 2025).  With that in mind, the

Court now turns to the evening that led to this litigation.  But the facts below are just an

overview; the Court will add detail in the analysis.

I.     **Factual Background**

On December 19, 2022, Mr. Riggs "sobb[ed]" throughout the day, drank some beer, and

told his wife that she "might need to commit him."  (ECF No. 124-1 at PageID 3966.)  And later

that evening Mr. Riggs "beat his head against a wall and door frame" in their home.  (*Id.*)

Concerned about her husband's well-being, Mrs. Riggs called 911 and asked for a paramedic.

(*Id.*)  Mr. Riggs heard his wife on the phone and ran out of house.  (*Id.*)  He had no shoes on and

---

[1] There are three sets of videos from Officers Armstrong, Gomez-Marquez, and Martin that add up to about six hours of footage.  Officer Gomez-Marquez and Armstrong's videos include footage from both their dash camera and body worn camera.  Specifically, the first 52 minutes from Officer Gomez-Marquez's video is dashcam footage, and the first 8:30 minutes from Officer Martin's video is also dashcam footage.  This will help orient the reader as they note various timestamps below.
[2] The Court relies on Defendants' response to Plaintiffs' statement of undisputed facts (ECF No. 12-3) and Plaintiffs' response to Defendants' joint statement of undisputed facts (ECF No. 124-1) to note where they disagree.

2

was wearing boxer shorts and a t-shirt. (*Id.*) This happened a little after 6:00 p.m., and the temperature was in the 30's. (*Id.*)

Mrs. Riggs—upset and crying—tells the 911 dispatcher what just happened. She states that Mr. Riggs is having mental health problems and is depressed, agitated, having "rage fits," and "knocked himself out." (911 Audio at 0:32, 1:18, 2:34.) Mrs. Riggs explains that she is afraid Mr. Riggs will either hurt himself or that officers will hurt him. (*Id.* at 7:09.) The dispatcher tells Mrs. Riggs not to worry—the officers have been trained on how to deal with individuals with "altered conscious." (*Id.* at 7:20.) Mrs. Riggs tells the dispatcher that Mr. Riggs also has spine problems and other chronic pain issues. (*Id.* at 7:36.) The dispatcher "promises" Mrs. Riggs that the officers will use "extreme caution" and that she has told the officers what "has been going on." (*Id.* at 11:47.) Mrs. Riggs says "what [Mr. Riggs] really needs is paramedics," but she knows paramedics are not trained to "catch him." (*Id.* at 12:38.)

Bartlett Police Officer Armstrong arrives at the Riggses home shortly after the call ends. (*See* Armstrong Video at 3:30.) Standing at the front door, Mrs. Riggs tells him that she is afraid Mr. Riggs will hurt himself, and that he is depressed and needs "psychological" help. (*Id.* at 3:37, 4:08; ECF No. 124-1 at PageID 3967.) She also tells Officer Armstrong that Mr. Riggs had knocked himself out earlier by hitting his head against the wall. (Armstrong Video at 4:08.) Mrs. Riggs says, "please don't hurt him" and explains that that Mr. Riggs has a "massive spine problem" and "chronic pain." (*Id.* at 4:36.) Officer Armstrong then leaves to search for Mr. Riggs. (*Id.* at 4:45.)

### A.   Chase and Struggle

Officer Armstrong spots Mr. Riggs at an intersection a few minutes later. (*Id.* at 11:16.) Officer Martin arrived at the intersection at almost the same time. (*Id.*; ECF No. 124-1 at

3

PageID 3967.)  Officer Martin gets out of his squad car and calls for Mr. Riggs.  (Martin Video at 9:14.)  He calmly says, "come here, man, don't run please . . . you're not in trouble."  (*Id.* at 9:15.)  Officers Armstrong and Martin move towards Mr. Riggs and yell "stop" after he ignores them.  (*Id.* at 9:20–40.)  Mr. Riggs then runs away from the Officers.  (*Id.*)  And the Officers chase him.  (*Id.*)

Because it is dark outside, it is hard to tell what happens next from the bodycam videos. One can hear but not see at times.  But the parties agree that Officer Martin was the was the first to reach Mr. Riggs.  (ECF No. 124-1 at PageID 3968.)  They also agree that Officer Martin grabbed Mr. Riggs's t-shirt and the three men ended up on the ground after Officer Armstrong arrived.  (*Id.* at PageID 3968–69; *see* ECF No. 123-3 at PageID 3911.)

The parties dispute what the bodycams do not show.  Mr. Riggs claims that the Officers tackled him as soon as they caught up.  (ECF No. 123-3 at PageID 3911.)  He claims that Officer Martin "delivered a knee strike to the left side of [his] abdomen while [he] was on his back, which caused him significant pain and made it difficult to breathe."  (*Id.* at PageID 3912.)  He also recalls feeling "another officer apply a knee to his back, although he [is] unable to identify which officer was responsible."  (*Id.*)

The Officers deny that either of them "applied a knee to Mr. Riggs's back."[3]  (*Id.* at PageID 3913.)  Instead, Officers Armstrong and Martin explain that they tried to grab Mr. Riggs as he ran way and "all three of them fell to the ground when the officers ultimately reached [him]."  (*Id.* at PageID 3911.)  In fact, Officer Martin alleges that Mr. Riggs "struck [him] in the mouth" and "knock[ed] out a temporary crown."  (ECF No. 109-5 at PageID 3631.)

---

[3] Officer Martin testified in his deposition that he was kneeling to the side of Mr. Riggs when he tried to handcuff him, and that Officer Armstrong's knees were on the ground when they applied the handcuffs.  (*Id.* at PageID 3913.)

All told, the "brief struggle" lasts about a minute.  (ECF No. 124-1 at PageID 3969.)  One of the Officers then turns a flashlight on, and the bodycam videos show Officer Armstrong handcuffing Mr. Riggs behind his back.  (*See* Martin Video at 9:40; Armstrong Video at 11:40–12:30.)  At his deposition, Mr. Riggs testified that he had tried to escape the Officers, struggled with them, and did not willingly put his hands behind his back to be handcuffed.  (ECF No. 124-1 at PageID 3969.)

Officer Gomez-Marquez arrives shortly after this.  (ECF No. 124-1 at PageID 3969.)  He asks if they should call for an ambulance; Officer Armstrong replies "no."  (Armstrong Video at 13:00.)  The Officers then walk Mr. Riggs to Officer Gomez-Marquez's squad car.  (*Id.* at 14:00–14:30.)

But Mr. Riggs will not get in the squad car.  (*Id.* at 14:40.)  Although his words are hard to make out—he is grunting and not speaking clearly—he appears to say, "leave me alone."  (*Id.* at 14:50–15:10.)  Mr. Riggs complains about his back and his wrist.  (*Id.* at 15:05, 15:57.)  And Officer Martin touches the handcuffs and says, "they are loose now."  (Martin Video at 13:26.)  When the Officers ask Mr. Riggs to have a seat, he says "no."  (*Id.* at 15:10–15:15.)  He also tells the Officers to "put a bullet in my head."  (*Id.* at 15:18.)  The Officers eventually push Mr. Riggs by the legs and pull him his upper body into the squad car.  (Armstrong Video at 15:00–16:20.)  Mr. Riggs sits in the back of the squad car for about thirty seconds before the Officers start to take him to Lakeside Behavioral Health Systems ("Lakeside"), a mental health provider.  (*Id.* at 16:57.)

**B.      Transport and Lakeside**

Officer Gomez-Marquez drives Mr. Riggs to Lakeside.[4]  As they start to drive off, the Officer tells Mr. Riggs that they are going to Lakeside to get him "some help."  (Gomez-Marquez Video at 52:00.)  Mr. Riggs is groaning off and on during the drive.  (*Id.* at 52:20–1:08:40.)  Officer Gomez-Marquez asks him "what's hurting."  (*Id.* at 1:02:11.)  Mr. Riggs says nothing about his wrist or handcuffs.  (*Id.*)  Officer Gomez-Marquez then directly asks whether his hands are hurting, and Mr. Riggs says "no."  (*Id.* at 1:03:22.)

When they arrive at the Lakeside parking lot,[5] Officer Gomez-Marquez asks Officer Martin if he loosened the handcuffs because Mr. Riggs is "complaining."  (Officer Gomez-Marquez Video at 1:16:00.)  Officer Martin responds, "the left one I could put my whole finger in, so I don't know what he is complaining about."  (*Id.*)  The Officers keep Mr. Riggs in the back of the squad car while they wait for Lakeside to let them in the building.  Mr. Riggs slumps over as the Officers open the car door.  (Armstrong Video at 37:45.)  Officer Armstrong asks if Mr. Riggs's sternum is broken because he is not moving.  (*Id.* at 37:50.)  Another Officer responds that he is "fine."  (*Id.*)  The Officers check his handcuffs again before walking Mr. Riggs into Lakeside. (*Id.* at 40:17.)  And as they enter Lakeside's waiting area, Officers Armstrong and Martin recheck the handcuffs.  (Martin Video at 2:17:55.)  Officer Martin observes that "they are sitting kind of low."  (*Id.*)

---

[4] Officer Gomez-Marquez's police report states that the Officers responded to a call from Mrs. Riggs "regarding suspect Donald Riggs have a psychotic mental episode."  (ECF No. 126-1 at PageID 4006.)  And that "on scene investigation determined [Mr. Riggs] was a danger to himself."  (*Id.* at PageID 4004.)  The Officers "charged" him with "emergency commitment" under Tennessee Code Annotated section 33-6-401.  *Id.*

[5] Lieutenant Holmes arrives at Lakeside after Mr. Riggs and the other Officers.  (ECF No. 124-1 at PageID 3971.)

6

Once they all enter Lakeside's medical area, an employee asks the Officers if Mr. Riggs tried to fight them. (Armstrong Video at 50:50.) Officer Armstrong responds that "he was trying to get away from us, and we basically had to tackle him." (*Id.* at 51:00.) He says Mr. Riggs was "not combative" but "running away." (*Id.* at 51:45.) Officer Martin later asks a Lakeside employee whether they can take the handcuffs off. (Martin Video at 2:30:00.) She replies "no" because they are waiting to give him medicine. (*Id.*; *see id.* 2:33:00.)

After Mr. Riggs has been seated and seen by Lakeside employees who examine him, he asks the Officers to adjust his arms so that the handcuffs can sit in front of him. (Armstrong Video at 1:05:20–1:05:30.) He then says, "this is killing me, I can't breathe." (*Id.* at 1:05:34.) And Lieutenant Holmes immediately orders the Officers to take his handcuffs off. (*Id.*) The Officers then remove the handcuffs. (*Id.*) The videos show marks around Mr. Riggs's wrists. (*Id.*) And although the conversation is difficult to make out, an Officer comments that the marks were because Mr. Riggs had "leaned so hard" against his wrists. (*Id.* at 1:06:00.) The Officers left after Lakeside admitted Mr. Riggs for treatment. (ECF No. 124-1 at PageID 3974.)

**C.      Treatment**

Lakeside's medical screening form shows that Mr. Riggs did not "meet criteria for Emergent Medical Condition based on physical findings." (ECF No. 112 at PageID 3757.) But he did "meet criteria for Emergent Medical Condition based on a risk of imminent harm to self/others due to psychiatric conditions." (*Id.*) And his intake form shows that he had a "moderate" suicide risk based on him "bang[ing] his head against door panel" and "ask[ing] police officers to shoot him." (*Id.* at PageID 3760.)

Although Lakeside initially admitted Mr. Riggs for inpatient services (*id.* at PageID 3766), it later called for an ambulance to take Mr. Riggs to Baptist Memorial Hospital ("Baptist

7

Hospital") after he complained of chest pain. (ECF No. 112 at PageID 3758; ECF No. 123-3 at PageID 3922–23.) The ambulance records show that Mr. Riggs had "no evidence of trauma" and that "he refused 911 earlier, but now he wants to go the ER for chest pain." (ECF No. 113 at PageID 3787.) Baptist Hospital diagnosed Mr. Riggs with a collapsed left lung, acute left rib fracture, and kidney stone. (*See* ECF No. 127-1 at PageID 4035.)

## II.   Procedural Background

A year later, Plaintiffs Mr. and Mrs. Riggs sued Officers Armstrong, Martin, Gomez-Marquez, Lieutenant Holmes and the City of Bartlett. (ECF No. 1.) Mrs. Riggs sues for loss of consortium against all Defendants (*id.* at PageID 18), and Mr. Riggs brings three claims. Mrs. Riggs seeks $250,000.00 and Mr. Riggs seeks $6,500,000.00. (*Id.* at PageID 20.)

His first is a § 1983 claim against the Officers, alleging unlawful seizure and excessive force. (ECF No. 1 at PageID 10–12.) The second is a § 1983 claim against the City. (*Id.* at PageID 13.) He alleges that the City violated his constitutional right by failing to supervise and train its officers "for a known and foreseeable occurrence of encountering citizens experience[ing] mental health crises." (*Id.* at PageID 14.) And that the City had a "custom and procedure of taking citizens to Lakeside Behavioral Health and leaving them there, or forcing admissions, without first providing necessary medical care." (*Id.*) His third claim seeks to hold the City liable under the Tennessee Governmental Tort Liability Act ("TGTLA") for the Officers' "negligence and false imprisonment of Plaintiff." (*Id.* at PageID 18.)

After discovery, Plaintiffs and Defendants moved to exclude each other's police expert witnesses. (ECF No. 91, 92.) The Court referred those motions to Magistrate Judge Annie T. Christoff. (ECF No. 119.) She granted Defendants' Motion to Exclude Plaintiffs' Expert John Tisdale and denied Plaintiffs' Motion to Preclude Expert Testimony of Thom Corley. (ECF No.

140.)  Plaintiffs then appealed her ruling to this Court.  (ECF No. 143.)  The Court affirmed her

Order because it was not clearly erroneous or contrary to law.  (ECF No. 146.)

Both sides then moved for summary judgment.  Plaintiffs moved first and argue that the

evidence warrants judgment in their favor as a matter of law.  (ECF No. 95.)  Defendants

responded, and Plaintiffs replied.  (ECF Nos. 123, 131.)  The City and the Officers in their

official capacities moved next.  (ECF No. 109.)  They argue that Plaintiffs have not shown any

unconstitutional custom or policy that caused Mr. Riggs's injuries; that the official capacity

claims against the Officers are redundant; and that the state-law negligence and false

imprisonment claims are barred by the TGTLA.  (*Id.*)  Plaintiffs responded, and the City replied.

(ECF Nos. 124, 133.)  Finally, the Officers moved for summary judgment in their individual

capacities, asserting qualified immunity.  (ECF No. 110.)  Plaintiffs responded, and the Officers

replied.  (ECF Nos. 125, 132.)  The Court now outlines the legal standard that governs these

motions before addressing them.

## LEGAL STANDARD

Under Rule 56, a "court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if "proof of that fact would establish or

refute an essential element of the cause of action or defense."  *Bruederle v. Louisville Metro*

*Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (citation omitted).  And a "genuine" dispute over

material fact occurs "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id.* (citation omitted).

It is the moving party's initial burden to show there is no genuine issue of material fact.

*Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citation omitted).  But if they clear

9

that hurdle, then the burden shifts to the nonmoving party to "set forth specific facts showing a triable issue of material fact." *Id.* (citation omitted).  The Court construes all reasonable inferences in favor of the nonmoving party.  *Patterson v. Kent State Univ.*, 155 F.4th 635, 644 (6th Cir. 2025).  And it does not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 249 (1986).

This all still applies when, as here, more than one party tries to resolve a case through summary judgment.  *See Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (citation omitted).  The Court still must "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Beck v. City of Cleveland,* 390 F.3d 912, 917 (6th Cir. 2004) (citation omitted); *see Craig*, 823 F.3d 382.

## I.    Defendants' Objections

Parties must comply with technical requirements when seeking or facing summary judgment motions.  *See* Fed. R. Civ. P. 56(c).  And Defendants object to nearly every statement in Plaintiffs' undisputed facts on that basis.  (*See* ECF No. 123-3.)  They argue Plaintiffs' statements fail to comply with Federal Rule of Civil Procedure 56(c)(1) or Local Rule 56.1 by not citing specific pages in the record; by citing bodycam footage without specifying which Officer's video or timestamp they rely on; and by relying on allegations in their Complaint.  (*See id.* at PageID 3908, 3923.)

The Court largely agrees.  Take these two examples.  Statement 9 in Plaintiffs' undisputed facts reads:

> Upon arrival, Mrs. Riggs again warned the officers that Mr. Riggs was suffering
> from mental illness and pleaded that they not harm him.  (Compl. ¶¶ 19–22;
> Defendant Armstrong Body Cam.)

(ECF No. 95-2 at PageID 874.)  And Statement 35 follows the trend:

10

> Mr. Riggs was diagnosed at Baptist Hospital with a fractured rib, collapsed lung, and acute kidney injury. He required a chest tube and ICU admission. (Medical Records, Baptist Hospital; Complaint ¶¶ 38–39).[] Collective Relevant Hospital Medical Records)

(*Id.* at PageID 877.) A quick review of the Federal Rules shows why Plaintiffs' statements fall short.

A party moving for summary judgment and asserting that a material fact is not in genuine dispute must do so by "citing to particular parts of material in the record." Fed. R. Civ. P. 56(c)(1)(A). Our Local Rules require the same. To "assist the Court in ascertaining whether there are any material facts in dispute," the moving party "shall" support each fact "by specific citation to the record." L.R. 56.1(a).

These Rules have practical purpose. For example, merely citing to "Medical Records" or "Collective Relevant Hospital Medical Records" does not help Plaintiffs' position. Without suitable citations, Plaintiffs effectively ask the Court to sift through hours of video and a vast record to make their case out for them.[6] This is too great of an ask in the average case. *See Vasser v. SaarGummi Tenn.*, No. 20-5223, 2021 WL 7084365, at *2 (6th Cir. Sept. 15, 2021) ("The district court was not required to sift through Vasser's unorganized, voluminous exhibits to find evidence that supported her arguments."). And every lawyer knows that merely citing to paragraphs in a complaint fails to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

But this is not the average summary judgment posture. The Court has three motions to consider. And unlike the statements of undisputed facts in support of Plaintiffs' motion,

---

[6] As the saying goes, "judges are not like pigs, hunting for truffles that might be buried in the record." *See Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (citation modified) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Plaintiffs responded to Defendants' undisputed facts for the most part, by complying with Rule 56 and Local Rule 56.1. (*Compare* ECF No. 124-1 at PageID 3973 (citing to medical records generally and the Complaint), *with id.* at PageID 3974 (citing to specific bodycam video with timestamps).) And so, given the depth of Plaintiffs' briefing here, Plaintiffs have not deprived the Court from finding which facts are genuinely in dispute. Nor has it prevented Defendants from presenting their arguments.

The Court therefore **OVERRULES** Defendants' objections to Plaintiffs' undisputed facts. *See Moore v. Bells Nursing Home, Inc.*, --F. Supp. 3d--, 2024 WL 6977045, at *1 (W.D. Tenn. Feb. 14, 2024) (concluding same). Even still, the Court reminds Plaintiffs that "[c]ourts do not abuse their discretion at summary judgment when they conclude that unexplained blanket references to an entire document . . . are neither specific or demonstrative" and accordingly deny relief. *Martinez v. City of Memphis*, No. 25-5494, 2025 WL 3516448, at *3 (6th Cir. Dec. 8, 2025) (discussing W.D. Tenn. L.R. 56.1(a)–(b)).

With that said, the Court will now address the merits of the parties' summary judgment motions. Because the Officers raise qualified immunity—which can have a cascading effect in these types of cases—it considers their Motion first.

## THE OFFICERS' MOTION FOR SUMMARY JUDGMENT

The Officers move for summary judgment, arguing that qualified immunity shields them from liability. (*See* ECF No. 110.) Mr. Riggs disagrees. (ECF No. 125.) He argues that clearly established law bars the Officers' qualified immunity and that genuine disputes of material fact preclude summary judgment in the Officers' favor. (*See id.* at PageID 3976–77, 3985–91.) For the reasons below, Mr. Riggs has not met his burden to overcome the Officers' qualified immunity. The Court therefore **GRANTS** the Officers' Motion.

For a § 1983 claim to succeed, the plaintiff must show that a person acting under color of state law deprived them of a right secured by the Constitution or federal law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). State officials, such as police officers, can assert the doctrine of qualified immunity as an affirmative defense when sued under this statute. *See Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 668 (6th Cir. 2022).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 320–21 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The doctrine balances two interests: the need to hold police officers accountable when they abuse their power and the need to protect police officers "from harassment, distraction, and liability when they perform their duties reasonably." *Est. of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (quoting *Pearson*, 555 U.S. at 231 (2009).

Whether qualified immunity applies is a question of law. *Hamilton v. Myers*, 281 F.3d 520, 530 (6th Cir. 2002). And when a defendant raises qualified immunity in a summary judgment posture, "the Court must weave the summary judgment standard into each step of [its] analysis." *Riethmeier v. Oakland Cnty.*, 808 F. Supp. 3d 764, 781 (E.D. Mich. 2025) (citing *Scott*, 550 U.S. at 378). Which means "[t]he issue of qualified immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (citation omitted). The plaintiff bears the burden of showing qualified immunity does not apply. *See Hall v. Navarre*, 118 F.4th 749, 759 (6th Cir. 2024); *Taylor v. City of Saginaw, Michigan*, 11 F.4th 483, 490 (6th Cir. 2021).

13

A plaintiff can meet this burden by showing that the defendant (1) violated the plaintiff's federal or statutory right; and (2) that the right at issue was "clearly established" when the alleged violation occurred. *See Guptill v. City of Chattanooga, Tennessee*, 160 F.4th 768, 776 (6th Cir. 2025). Courts can address the two prongs in any order. *Goodwin*, 781 F.3d at 321. And if the answer is "no" to either, qualified immunity protects the officer's actions. *Id.*

This is a difficult but not impossible burden for a plaintiff to meet. *Cf. Cunningham v. Shelby County, Tennessee*, 994 F.3d 761 (6th Cir. 2021); *Hall*, 118 F.4th at 759 ("Consider the formidable legal regime [a plaintiff] faces given [a defendant's] assertion of qualified immunity." (citation omitted)). That is because qualified immunity provides law enforcement "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam)).

A plaintiff "need not point to a case on all fours with the instant fact pattern" to meet the clearly established prong. *Guptill*, 160 F.4th at 780 (quoting *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023)). This is especially true if "the obvious cruelty inherent in a practice can contribute to the conclusion that an act was so aberrant that every reasonable official would have understood that it was unconstitutional." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (citation modified) (citing *Hope v. Pelzer*, 536 U.S. 730, 741–46 (2002)). But beyond that, a plaintiff must point to "sufficiently analogous case (or cases) from which a reasonable official would understand what he is doing violates that right." *Id.* And that precedent must have placed the constitutional issue "beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation omitted). "The dispositive question is 'whether the violative nature of the *particular* conduct is clearly established." *Id.*

14

(citation omitted).  All this is to ensure that the defendant knew his "actions were unlawful in the situation [he] confronted."  *Hall*, 118 F.4th at 759 (quoting *Lanman v. Hinson*, 529 F.3d 673, 688 (6th Cir. 2008)).

Mr. Riggs asserts two main constitutional violations here: unlawful seizure and excessive force.  (ECF No. 1 at PageID 10–13.)  The Court considers these claims in turn.

## I.      Unlawful Seizure

Mr. Riggs first alleges that the Officers violated his Fourth Amendment right by unlawfully detaining him and transporting him to Lakeside. [7]  (ECF No. 1 at PageID 10–11.) The Officers maintain that they did not violate Mr. Riggs's right because probable cause supported detaining him for a mental health evaluation.  (ECF No. 110-1 at PageID 3746–47; ECF No. 132 at PageID 4288.)  Mr. Riggs counters that factual disputes preclude a probable cause finding.  (ECF No. 125 at PageID 3991–94.)  But the evidence shows that the Officers had probable cause to detain Mr. Riggs.  And so, as explained below, the Officers did not violate Mr. Riggs's constitutional right when they seized him.  The Officers are therefore entitled to qualified immunity for this claim.

---

[7] Mr. Riggs also alleges the unlawful seizure violated his Fourteenth Amendment right.  (ECF No. 1 at PageID 10–11.)  *See* U.S. Const. Amend. XIV (barring states from depriving "any person of life, liberty, or property, without due process of the law).  But he otherwise never mentions anything about due process.  So if Mr. Riggs intended to bring a due process claim here, he has waived it.  *See Zucker v. City of Farmington Hills*, 643 F. App'x 555, 572 (6th Cir. 2016) ("Though we harbor doubts about the merits of this argument, *see generally Pino v. Higgs,* 75 F.3d 1461, 1469 (10th Cir.1996) (explaining contours of the Fourth and Fourteenth Amendments in cases involving mental-health seizures), "we need not consider it now because Zucker forfeited his due-process claim by failing to explain or support it in the district court before the court entered judgment in favor of the defendants.").  At any rate, the Fourth, not Fourteenth, Amendment applies to this  seizure.  *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (citing *Zeigler v. Aukerman*, 512 F.3d 777, 783–84 (6th Cir. 2008)); *see also Pino*, 75 F.3d at 1469 ("Moreover, because Appellant has failed to establish that Appellees unreasonably seized her in violation of the Fourth Amendment, her Fourteenth Amendment due process claims also necessarily fail.").

It is clearly established that the Fourth Amendment requires officers "seizing and detaining a person for psychiatric evaluation to have probable cause to believe that the person is dangerous to himself and others." *Machan v. Olney*, 958 F.3d 1212, 1214 (6th Cir. 2020) (quoting *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)); *see Rudolph v. Babinec*, 939 F.3d 742, 747 (6th Cir. 2019) (per curiam) (citing *Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005)). Probable cause to detain someone for a psychiatric evaluation does not require an actual showing of dangerous behavior. *Machan*, 958 F.3d at 1214 (quoting *Zeigler v. Aukerman*, 512 F.3d 777, 783 (6th Cir. 2008)). Instead, "[a] showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior." *Id.* Courts evaluate probable cause "from the perspective of a reasonable and objective person in the position of the seizing official." *Fisher*, 398 F.3d at 843 (citing *Monday*, 118 F.3d at 1102).

Compare that standard to the facts here. Mrs. Riggs told the 911 dispatcher that her husband was having mental health problems and was depressed, agitated, having "rage fits," and had "knocked himself out." (911 Audio at 0:32, 1:18, 2:34.) The dispatcher then told the Officers about this. (*Id.* at 11:47; ECF No. 124-1 at PageID 3966.) And when Officer Armstrong spoke with Mrs. Riggs, she explained that Mr. Riggs was depressed and needs "psychological" help. (911 Audio at 3:37, 4:08; ECF No. 124-1 at PageID 3967.) She also told him that Mr. Riggs had knocked himself out after hitting his head against the wall. (911 Audio at 4:08.) So by the time the Officers encountered Mr. Riggs, they had probable cause to believe that he was a danger to himself. *See Machan*, 958 F.3d at 1214.

But there is more. After the Officers detained Mr. Riggs and brought him back to Officer Gomez-Marquez's squad car, Mr. Riggs told them to "put a bullet in [his] head." (Armstrong Video at 15:18.) This comment also supports a finding that the Officers reasonably believed

16

they had probable cause to take Mr. Riggs to Lakeside for a mental evaluation. *See Ziegler*, 512 F.3d at 784 ("It is enough that [the Officers] had information such that a reasonable person in the officer's position would believe it probable that [Mr. Riggs] was a danger to h[im]self or others.").

The primary case Mr. Riggs relies on—*Rudolph v. Babinec*—does not change this conclusion. (*See* ECF No. 125 at PageID 3993–94.) He is correct that the *Rudolph* court denied qualified immunity to officers who detained someone they thought was suicidal. 939 F.3d at 747. But that was because, unlike here, the officers *unreasonably* believed that to be true. *Id.* at 749. It helps to start from the beginning of that case to see why.

In *Rudolph*, officers pulled a man named Kyle over for speeding. *Id.* at 748. When he later stepped out of his car for a sobriety test, Kyle told the officers that he had taken a gun from his intoxicated ex-wife, Rudolph. *Id.* The officers then decided to check on Rudolph out of "concern for her wellbeing." *Id.* Importantly, the Sixth Circuit noted "there is a question of fact as to whether Kyle stated that Rudolph was suicidal, and there is no evidence that Kyle requested the officers to check on Rudolph." *Id.* When she eventually answered the door, Rudolph "appeared to be intoxicated" yet "denied being suicidal." *Id.* at 149. And as for the gun, it was no longer in the house. *Id.* Undeterred, the officers told Rudolph she could either go to the hospital voluntarily or be "taken into custody involuntarily for a mental-health check." *Id.* at 746. After a bit of back and forth, the officers allegedly dragged her across the driveway and took her to a hospital. *Id.*

The *Rudolph* court reasoned that the officers "apparently executed this mental-health seizure because they determined that Rudolph's intoxication alone provided support for her ex-husband's alleged assertion that she was suicidal." *Id.* This was an "unreasonable logical leap."

17

*Id.* And so "[w]ithout any further evidence at the scene of the wellness check or inquiry into whether Rudolph tried to harm herself, the officers [] lacked probable cause to execute this mental-health seizure." *Id.*

In other words, the officers' own interaction with Rudolph negated her ex-husband's statement that she was suicidal. Yet here, the Officers' interactions with Mr. Riggs only increased their concern that he was a danger to himself. It requires no "unreasonable logical leap" to conclude that a reasonable person in the Officers' position would find probable cause to execute a mental health seizure. Mr. Riggs has therefore not shown that the Officers violated constitutional right by detaining and transporting him to Lakeside.[8] *See Ziegler*, 512 F.3d at 784 ("It is enough that [the Officers] had information such that a reasonable person in the officer's position would believe it probable that [Mr. Riggs] was a danger to h[im]self or others."). And so the Officers are entitled to qualified immunity for the seizure and the transportation to Lakeside. Next the court will look at the claim of excessive force.

---

[8] The Officers state that the facts here gave them reasonable grounds to conclude that they should detain Mr. Riggs under Tennessee's emergency detention statute, Tenn. Code Ann. § 33-6-401 (2022). (*See* ECF No. 110 at PageID 3730; ECF No. 110-1 at PageID 3746–47.) Courts construe this statute under the probable cause framework. *Cf. Reeners v. Troup*, No. 15-0625, 2020 WL 409746, at *16 (M.D. Tenn. Jan. 23, 2020); *Hargis v. Overton Cnty.*, No. 22-0011, 2023 WL 7930045, at *19 (M.D. Tenn. Nov. 15, 2023). Because of that, the Officers complied with § 33-4-401 for the same reasons they complied with the Fourth Amendment's probable cause requirement.

But Mr. Riggs argues that the Officers failed to comply with § 33-6-404 because Lakeside took "well over an hour" to examine him. (ECF No. 125 at PageID 3994.) The statute requires that once an involuntary detainee is taken into custody, a "physician, psychologist, or designated professional shall *immediately* examine[] the person and decide whether the person is subject to admission." Tenn. Code. Ann. § 33-6-404 (emphasis added). Mr. Riggs does not explain why that delay, if it did in fact violate the statute's immediacy requirement, should be attributable to the Officers. Nor does he explain how § 33-6-404 factors into the probable cause analysis here. So this argument lacks merit even if the Court were to look past the fact "that a plaintiff cannot allege a violation of state law in an action under 42 U.S.C. § 1983." *Zucker*, 643 F. App'x at 565 (citations omitted).

18

**II.    Excessive Force**

The Fourth Amendment protects individuals from excessive force by law enforcement officers.  *Guptill*, 160 F.4th at 767 (citing *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022), *abrogated on other grounds by Barnes v. Felix*, 605 U.S. 73, 83 (2025), *as recognized by Booth v. Lazzara*, 164 F.4th 581, 593 (6th Cir. 2026)).  But not all force is excessive within context— officers may use *some* reasonable force to detain someone.  *See Graham v. Conner*, 490 U.S. 386, 396 (1989).  And "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment."  *Id.* (internal quotations and citation omitted).

To figure out when force is excessive and thus unconstitutional, courts ask "whether the officer's actions were 'objectively reasonable in light of the facts and circumstances confronting them.'"  *Guptill*, 160 F.4th at 767.  An officer's reasonableness depends on the "totality of the circumstances" based on "only [] the facts the defendant officer knew at the time."  *Id.*  This is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Goodwin*, 781 F.3d at 321).

Courts generally use the three *Graham* factors to assess objective reasonableness.  *Est. of Hill*, 853 F.3d at 312 (citing *Graham v. Conner*, 490 U.S. 386, 397 (1989)).  Those are "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of other officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (internal quotation marks omitted).  But those factors alone do not fit every situation.  And an unarmed detainee's "diminished capacity . . . must [also] be taken into account when assessing the amount of force exerted."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d

19

893, 904 (6th Cir. 2004) (citation omitted). So in cases like this one, courts also consider "(1) whether it was a [mental] emergency that rendered [the person] incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others; (2) whether some degree of force [was] reasonably necessary to ameliorate the immediate threat"; and (3) whether the force used [was] more than reasonably necessary under the circumstances (i.e., was it excessive)." *Guptill*, 160 F.4th at 777 (internal quotation marks omitted) (quoting *Est. of Hill*, 853 F.3d at 314). Neither these factors nor the *Graham* factors are exhaustive or dispositive in every case. *Id.* They serve as guideposts to evaluate the totality of the circumstances. *Id.*

With that in mind, Mr. Riggs asserts that Officers Armstrong, Martin, Gomez-Marquez, and Lieutenant Holmes violated his right to be free from excessive force in various ways on December 19, 2022.[9] (ECF No. 1 at PageID 12–13.) He specifically claims that the Officers used unlawful and excessive force when: (1) Officers Armstrong and Martin "tackled" him; (2) Officer Martin placed his knee on his back while detaining and handcuffing him; (3) Officers Armstrong, Martin, and Gomez-Marquez put him into the squad car; (4) the Officers kept him in tight handcuffs for too long; and (5) the Officers failed to intervene. (*See id.*) To address these claims, the Court "must segment the incident into its constituent parts and consider [each Officers'] entitlement to qualified immunity at each step along the way." *Wright v.*, 962 F.3d at 865 (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam)).

---

[9] Mr. Riggs also brings this claim under the Fourteenth Amendment. (*See* ECF No. 1 at PageID 13.) To be sure, excessive force claims can implicate the Fourth, Eighth, and Fourteenth Amendments. *See Hopper v. Phil Plummer*, 887 F.3d 744, 751 (6th Cir. 2018). But it is the Fourth Amendment that applies to excessive force claims alleged within the context of a mental health seizure. *See Clay*, 797 F.3d at 369; *cf. id.* ( noting the distinction between the Fourth and Fourteenth Amendment is "purely academic" because the same objective standard applies to each (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).

20

###### A.      Takedown

Officers Armstrong and Martin argue Mr. Riggs's claim that they used excessive force when first encountering him fails as a matter of law.  (ECF No. 110-1 at PageID 3749.)  That is because no clearly established law put them on notice that "a takedown of a fleeing suicidal person" was unconstitutional.  (ECF No. 132 at PageID 4289.)  Mr. Riggs, on the other hand, contends that whether the "degree of force" the officers used is reasonable is a question of fact for the jury.[10]  (*See* ECF No. 125 at PageID 3983.)  But it is not.  As explained below, the Court finds that the Officers are entitled to qualified immunity here.

A quick review of the facts sets the stage.[11]  By the time Officers Armstrong and Martin located Mr. Riggs, they knew that Mr. Riggs had chronic pain and spine issues.  (*See* Armstrong Video at 3:30–4:36; *see* 911 Audio at 11:47.)  The Officers eventually locate Mr. Riggs wandering through someone's yard in the dark.  (Martin Video at 9:14.)  The bodycam footage shows Officer Martin getting out of his squad car and calmly telling Mr. Riggs, "come here, man, don't run please . . . you're not in trouble."  (*Id.*)  As Officers Armstrong and Martin then move towards Mr. Riggs, he starts to run and they yell "stop."  (*Id.* at 9:20–40.)  The Officers chase Mr. Riggs once he runs away from them.  (*Id.*)

Remember, the bodycam footage does not show the takedown.  But the parties agree that Mr. Riggs tried to run and that Officer Martin grabbed Mr. Riggs's t-shirt as he ran away.  (*Id.* at PageID 3968–69; *see* ECF No. 123-3 at PageID 3911.)  They also agree that the three men

---

[10] Mr. Riggs also argues that the Officers had a duty to deescalate before "engaging him physically."  (ECF No. 125 at PageID 3981–82.)  "'But no caselaw supports' the claim that officers must *always* try 'alternative de-escalation techniques' before using any force on mentally ill suspects."  *Booth*, 164 F.4th at 593 (quoting *Roell v. Hamilton Cnty., Ohio*, 870 F.3d 471, 482 (6th Cir. 2017)).

[11] The Court considers these Officers' actions together for this claim because their actions overlap.

21

quickly ended up on the ground after Officer Armstrong caught up. (*Id.*) Mr. Riggs

characterizes this as a "tackle." (ECF No. 123-3 at PageID 3911.) Although the Officers seem to

disagree with this description, Officer Armstrong told a Lakeside employee that Mr. Riggs "was

trying to get away from us, and we basically had to tackle him." (Armstrong Video at 51:00.)

He also explained that Mr. Riggs was "not combative" but "running away." (*Id.* at 51:45.)

To be sure, "a takedown maneuver . . . can amount to excessive force." *LaPlante v. City

of Battle Creek, Michigan*, 30 F.4th 572, 581 (6th Cir. 2022). When an officer takes down a

cooperative or non-resisting detainee, that can also implicate reasonableness. *See id.*; *McCaig v.

Raber*, 515 F. Appx 551, 555 (6th Cir. 2013) (finding that a reasonable jury could conclude that

an officer's takedown maneuver was not objectionably reasonable when a suspect "made no

aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that

he would 'go easy'"); *Meirthew v. Amore*, 417 F. Appx 494, 497–98 (6th Cir. 2011) (denying

qualified immunity where the officer used an arm-bar takedown in a police station when the

suspect was handcuffed and surrounded by officers).

For example, in *LaPlante*, a case Mr. Riggs cites, an officer "grabbed [the plaintiff's]

shoulders, bent his knees, and pulled [him] towards the ground, causing [him] to land on the

street in a prone position," and then "proceeded to put pressure on [the plaintiff's] back, upper

body, arms, and the side of his head." *Id.* at 576, 581. The Sixth Circuit denied qualified

immunity because there were genuine disputes about whether the plaintiff attempted to surrender

before the officer used force. *Id.* There is no such question here—Mr. Riggs ran from the

Officers and tried "his best to escape." (ECF No. 124-1 at PageID 3969.)

So the Court does not find the amount of force used here—whether characterized as a

tackle or takedown—creates a genuine dispute of a material fact to be resolved by a jury. *See*

22

*Lyons v. City of Xenia*, 417 F.3d 565, 578 (6th Cir. 2005) (collecting cases showing that

"tackling" rises to excessive force when "the police did more than just tackle the suspect" (citing

*Phelps v. Coy,* 286 F.3d 295, 298, 302 (6th Cir. 2022) (court found constitutional violation for

summary judgment purposes when the plaintiff alleged that officers tackled him, hit him, and

slammed his head into the floor three times); *Barlow v. Ground,* 943 F.2d 1132, 1136 (9th

Cir.1991) (police tackled suspect and put him in a punishing "pain compliance hold")).

The three cases Mr. Riggs cites for the proposition that "the use of force against a

mentally ill, non-threatening individual violates clearly established law" fare no better.  (ECF

No. 125 at PageID 3989.)  The first case concerns officers tazing, and later shooting, a mentally

unstable individual.  *See Palma*, 27 F.4th 419.  None of that happened here.  The second case has

nothing to do with excessive force or police officers.  *See Terrance v. Northville Reg'l*

*Psychiatric Hosp.*, 286 F.3d 834 (6th Cir. 2002) (bringing Eighth Amendment deliberate

indifference and due process claims against a hospital, a state mental health department, and

hospital personnel).  And the third case deals with a prisoner's excessive force claim under the

Eighth, not Fourth Amendment.  *See Griffin v. Hardrick*, 604 F.3d 949 (6th Cir. 2010); *see also*

*Hopper v. Phil Plummer*, 887 F.3d 744, 751–52 (6th Cir. 2018) (discussing the differing

standards between Fourth and Fourteenth Amendment claims and Eighth Amendment claims).

The Court need not belabor the issue any further.

Put simply, Mr. Riggs has not met his burden to show that the "takedown" was excessive

or violated any clearly established right.  *Cf. Brown v. Giles*, 95 F.4th 436, 439–40 (6th Cir.

2024) ("At the outset, [the plaintiff] runs into trouble because we've held that it's reasonable for

officers to tase fleeing suspect" (citations omitted)).  Nor has he pointed to a material question of

fact that needs to be resolved by a jury. And so the Court finds that Officers Armstrong and Martin are entitled to qualified immunity for this claim.

### B.    Knee on Back

Mr. Riggs claims that Officer Martin used excessive force after the takedown by placing a knee on his back while putting the handcuffs on.[12] (ECF No. 1 at PageID 9, 12.) Officer Martin argues that this claim fails because the "alleged knee strike" occurred "as Mr. Riggs[] struggled and resisted being handcuffed." (*See* ECF No. 132 at PageID 4287.) But Mr. Riggs argues that Officer Martin's knee use "was excessive and objectively unreasonable under the circumstances, particularly given Mr. Riggs's known mental health condition and lack of physical threat to officers." (ECF No. 125 at PageID 3995.) He also states in a conclusory manner that Officer Martin violated clearly established law. (*Id.* at PageID 3996.) Neither of these arguments holds water, and Officer Martin is entitled to qualified immunity for the reasons below.

Mr. Riggs concedes that he tried to run away from the Officers, did "his best to escape," struggled, and did not willingly put his hands behind his back to be handcuffed. (ECF No. 124-1 at PageID 3969.) This means that Mr. Riggs admits that he resisted Officer Martin. *See Kelly v. Sines*, 647 F. App'x 572, 575 (6th Cir. 2016) (explaining that active resistance includes physically struggling with or disobeying officers (citation omitted)); *Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017) ("We have found active resistance where a

---

[12] The Complaint brings this claim against Officer Armstrong as well. (ECF No. 1 at PageID 12.) But Mr. Riggs admitted in his deposition that Officer Armstrong did not knee him. (ECF No. 110-1 at PageID 3734.) And he no longer maintains this claim against Officer Armstrong. (*See* ECF No. 95-1 at PageID 860; ECF No. 125 at PageID 3978.)

suspect physically struggles with police, threatens or disobeys officers, or refuses to be handcuffed." (citations omitted)).

And "[w]hen an individual experiencing a medical emergency actively resists being held under control by medical staff or law enforcement, some level of force may be reasonably necessary to ameliorate an immediate threat." (citing *Est. of Hill*, 853 F.3d at 315)).  So Officer Martin using his knee to counter Mr. Riggs's resistance and handcuff him does not alone rise to a constitutional violation.  *See Graham*, 490 U.S. at 396 (recognizing "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it" (citation omitted)).  But it could if Officer Martin's timing is off: "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015).  The record here, however, forecloses any doubt about the latter option.  *Cf. King v. City of Rockford, Michigan*, 97 F.4th 379, 396 (6th Cir. 2024) ("[W]e have deemed tasers, knee strikes, and other force necessary to subdue suspects justified where the suspects repeatedly refused to comply and physical resisted arrest." (citation omitted).

A brief return to the facts shows why.  Only about a minute passes between Officer Martin first catching up to Mr. Riggs and placing him in handcuffs.  (*See* Martin Video at 9:40; Armstrong Video at 11:40–12:30.)  And when a flashlight comes on immediately afterward, Officer Martin is seen next to—not on top of—Mr. Riggs.  (Martin Video at 10:30.)

Mr. Riggs contends that Officer Martin "delivered a knee strike to the left side of Mr. Riggs's abdomen while Mr. Riggs was on his back."  (ECF No. 123-3 at PageID 3912.)  His counsel argues that this occurred *after* "Mr. Riggs was already subdued."  (ECF No. 125 at PageID 3978, 3995.)  But when asked in his deposition whether Officer Martin or Armstrong

25

"kick[ed] [you] with a knee" "after they finished cuffing you," Mr. Riggs testified: "I could not tell you at that point because I was in too much pain and I couldn't breathe or speak at that point." (ECF No. 96-2 at PageID 1099.) He also explained that "my right arm got pulled out and at that point I felt Martin, you know, knee just—and it came straight up, hit me right there."[13] (ECF No. 96-1 at PageID 1018.) Officer Martin denies ever doing this. (ECF No. 123-3 at PageID 3912.)

So taking the facts in light most favorable to Mr. Riggs, Officer Martin placed his knee on Mr. Riggs's back when he resisted being handcuffed. And the Court presumes that Officer Martin's knee lingered on his back for a short time afterward. But as Mr. Riggs notes, "[i]t was [] a short process." (ECF No. 96-1 at PageID 1019.)

Mr. Riggs relied heavily on *Champion* at the summary judgment hearing to allege that Officer Martin's use of his knee was excessive force. He also relies on it in his brief. (ECF No. 125 at PageID 3995.) *See Champion*, 380 F.3d at 903 ("Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force."); *see also Martin v.*

---

[13] Mr. Riggs further testified:

> I mean, it's a—from the time I was on my feet and off my feet was, you know, pretty short. I can't—you are describing me like—or the way—it sounds like you're describing it is like this long process, but it wasn't. It was like a short process, where as far as me, here's my arms or anything like that. There was not even time for that kind of movement or, you know, they—you know, I started out on my back. I got hit right here and I know it, that knocked the air out of me. And next thing I knew I was on my face, and I felt a knee or elbow or something very hard on the middle of my back. And I heard my name once or twice during that moment. And then, you know, I was incapacitated where I couldn't move, and they tried to roll me over.

(*Id.* at PageID 1019–20.)

26

*City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013) ("*Champion* proscribes the use of 'substantial or significant pressure' that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others.").

But *Champion* does not fit here. In that case, more than one officer sat on a mentally unstable man's back after he was face down, handcuffed, and bound at the ankles with a hobble strap. 380 F.3d at 897–98. And the officers continued to sit on his back—and even pepper sprayed him—after he stopped resisting. *Id.* at 903. The man vomited a few times, went into cardiac arrest and died. *Id.* at 898, 905. The Sixth Circuit reasoned "[n]o reasonable officer would continue to put pressure on [an] arrestee's back after the arrestee was subdued by handcuffs, an ankle restraint, and a police officer holding the arrestee's legs." *Id.* at 905. Yet here, Mr. Riggs was resisting during the moment a single officer placed a knee on his back while trying to handcuff him. And just after Mr. Riggs is in handcuffs, the bodycam footage shows Officer Martin at his side. The Court therefore finds the facts here are much different than the facts in *Champion*.

Mr. Riggs's other cases similarly do not hold up. (ECF No. 125 at PageID 3995–96.) For example, the Sixth Circuit in *Baker v. City of Hamilton* reasoned that a reasonable jury could find excessive force where an officer used a baton to strike surrendering arrestees in their head and knee. 471 F.3d 601, 607–08 (6th Cir. 2006). It also found the officer violated the plaintiffs' clearly established law to be "free from gratuitous violence during arrest." *Id.* Despite Mr. Riggs's contention that *Baker* is similar to his claim (ECF No. 125 at PageID 3996), what happened in *Baker* is a far cry from what happened here. Officer Martin pressing his knee

against Mr. Riggs is not the same  as the "gratuitous violence" from baton strikes to the head and knee in *Baker*.[14]

In sum, Mr. Riggs has not met his burden here.  The cases he relies on apply to individuals who are not resisting.  It is true that Mr. Riggs was mentally unstable like the plaintiff in *Champion*.  But Officer Martin did not apply his knee after Mr. Riggs was bound by other officers with handcuffs and a "hobble strap."  And his knee did not create an asphyxiating condition.  Nor did Officer Martin use a baton to strike Mr. Riggs's head and legs as in *Baker*.  It follows that Mr. Riggs provided no case showing that Officer Martin acted unreasonably or that he violated clearly established law by using a knee while trying to handcuff a resisting, mentally unstable man with spine problems who had been running, partially clothed, at night through someone else's yard.  Officer Martin is therefore entitled to qualified immunity.

---

[14] Mr. Riggs also cites *Smith v. Troy*.  There, an officer responded to a report of suspicious activity.  874 F.3d at 942.  He found a man swaying back and forth and holding onto a chain link fence.  *Id.*  The officer told the man to come to his police car, but the man kept holding onto the fence.  *Id.*  He told the officer that he was sick and needed to use a restroom.  *Id.* at 945. The officer approached, pulled the man's fingers off the fence, and performed a "leg sweep."  *Id.* 942.  The man hit the ground "facedown" and the officer fell on top of him.  *Id.*  Another officer arrived and then tased him eight times "during an encounter . . . that lasted less than two minutes."  *Id.*  Neither officer had never told the man he was under arrest.  *Id.*  And it turns out that he had just had a seizure.  *Id.*  The Sixth Circuit found that a reasonable officer would have known this amounted to excessive force given the circumstances.  *Id.* at 945.  And that it was "well-established at the time of the incident in this case that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force."  *Id.* (citing *Kent v. Oakland Cnty.*, 810 F.3d 384, 396 (6th Cir. 2016)).

It is hard to tell whether Mr. Riggs is trying to compare *Smith*'s leg sweep with Officer Martin's knee in his back.  But if so, he is not persuasive.  The Court sees little similarity between the facts here and the force in *Troy* against a non-resisting person leaning against a fence.  Mr. Riggs admits he resisted so the cases differ from the start.  And Officer Martin "did not employ a comparable amount of force" as the officer in *Smith*.  *Gray v. Shelby Cnty., Tennessee*, No. 22-5542, 2023 WL 5237373, *7 (6th Cir. Aug. 15, 2023) ("[The officer] did not employ a comparable amount of force [as in *Smith*]; [the plaintiff] was not taken to the ground during her encounter with [the officer] prior to his backup arriving.").

### C.        Placement into Squad Car

Mr. Riggs next claims that Officers Armstrong, Martin, and Gomez-Marquez used excessive force when pushing and pulling him into the squad car.  (ECF No. 1 at PageID 12–13.) The Officers assert that this claim fails because Mr. Riggs resisted their attempts to guide him into the squad car.  (ECF No. 132 at PageID 4295.)  In other words, Mr. Riggs's mental and physical condition did not bar them from using reasonable force to overcome his resistance.  (*Id.*) The thrust of Mr. Riggs's counterargument is that "forcibly pushing Mr. Riggs into the vehicle without attempting de-escalation or accommodating his condition constituted excessive force." (ECF No. 125 at PageID 3982.)  The Court disagrees.  Not only did the Officers use reasonable force given the circumstances, but Mr. Riggs again has not offered any clearly established law that would change that conclusion.  So the Officers are entitled to qualified immunity for the reasons below.[15]

After the Officers walked Mr. Riggs to Officer Gomez-Marquez's squad car, he refused to go inside.  (Armstrong Video at 14:40.)  Not only did he say "no" when they asked him to have a seat, but he stiffened up and braced his legs against the car.  (Martin Video at 13:26– 15:18.)  He also tells the Officers to "put a bullet in [his] head."  (*Id.* at 15:18.)  After that, the Officers begin pushing Mr. Riggs by the legs and pulling him by his shoulder and arms into the squad car.  (Armstrong Video at 15:00–16:20.)  It takes them a little over a minute to secure Mr. Riggs in the back of Officer Gomez-Marquez's vehicle.  (*Id.*)

Start with Mr. Riggs's de-escalation argument.  He is correct that Officers should use their training to determine how to de-escalate a mentally unstable individual before using force.

---

[15] The Court considers the Officers actions together here because Mr. Riggs does the same, and each Officer pulled or pushed Mr. Riggs into the vehicle at one point or another.

(ECF No. 125 at PageID 3982.)  *See Palma*, 27 F.4th ("True, we have suggested that officers must use their expert judgment to consider whether 'to de-escalate a situation' involving those suffering from mental disabilities before deploying force." (quoting *Palma*, 27 F.4th at 438)). "'But no caselaw supports' the claim that officers must *always* try 'alternative de-escalation techniques' before using any force on mentally ill suspects." *Booth*, 164 F.4th at 593 (6th Cir. 2026) (quoting *Roell v. Hamilton Cnty., Ohio*, 870 F.3d 471, 482 (6th Cir. 2017)).  Instead, Mr. Riggs's diminished capacity is something the Court considers "when assessing *the amount of force asserted*." *Palma*, 27 F.4th 438 (quoting *Roell*, 870 F.3d at 482).  And here, the Court finds the amount of force was reasonable.

That is because Mr. Riggs overlooks that the Officers *did* try less forceful methods of getting Mr. Riggs into the squad car.  His brief reads as though the Officers "forcibly push[ed]" Mr. Riggs into the squad car out of sheer aggression and without warning.  (*See* ECF No. 125 at PageID 3982.)  That is not what happened here.  The bodycam footage shows the Officers asking Mr. Riggs to get into the vehicle, Mr. Riggs refusing both verbally and physically, and telling the Officers to put a bullet in his head.  It was at that point that the Officers used more forceful means—pushing and pulling—to guide him into the vehicle.  And "[w]hen police have probable cause to seize individuals for a mental-health evaluation, the police also have the right to use the force required to take the individuals to the hospital—even if they do not want to go." *Booth*, 164 F.4th at 592 (citing *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997)).

Mr. Riggs next states that "the instructive language" in *Morrison v. Board of Trustees* placed the Officers on notice "that they could not push Mr. Riggs into the vehicle with such force, particularly when he was known or perceived to be experiencing a mental crisis or episode and when he was already handcuffed." (ECF No. 125 at PageID 3982.)  But he does not explain

what "instructive language" he is referring to here.  At any rate, the *Morrison* court denied

qualified immunity to an officer who "*repeatedly* pushed [the plaintiff's] face into the ground

every time she attempted to speak while she was already handcuffed, lying down, and *compliant*

with the officer's commands."  593 F.3d 394, 407 (6th Cir. 2009) (emphasis added).  This led the

Sixth Circuit to find, unsurprisingly, that the officer's force crossed into the unconstitutional

realm of "physical abuse of an incapacitated suspect."  *Id.* at 407 (citation omitted).  But the

Officers here did not cross that line.  They did not inflict violence on a compliant and

incapacitated detainee.  The Officers instead asked Mr. Riggs several times to enter the squad car

and only used their force—again, pushing and pulling—to get into him into the vehicle when he

refused to do so himself.

Mr. Riggs points to no case holding that the Fourth Amendment requires police officers

to sit back and hope a detainee gets into a squad car after the detainee has orally refused to do so,

made a suicidal comment, and then physically resisted getting into the vehicle.  Put another way,

this Court found no case that "imposes such a low bar for establishing a claim of excessive

force."  *Toner v. Village of Elkton*, 547 F. App'x 720, 728 (6th Cir. 2013).  Mr. Riggs accordingly

cannot make out a Fourth Amendment violation.  Nor can he show clearly established law

barring this result.  The Officers are again entitled to qualified immunity.

### D.    Handcuff Tightness and Duration

Mr. Riggs next claims that the Officers used excessive force by keeping him in overly

tight handcuffs for too long.  (ECF No. 1 at PageID 9.)  He brings this claim against each

individual Defendant here—Officers Armstrong, Martin, Marquez, and Lieutenant Holmes

(together, "Officers").  The Officers contend this claim fails because Mr. Riggs does "not

articulate a right violated by the officers, who did not ignore Mr. Riggs's complaints about his

31

handcuffs and repeatedly checked the cuffs." (ECF No. 132 at PageID 4290; *see* ECF No. 110-1 at PageID 3739–40.) Mr. Riggs, on the other hand, argues that whether the Officers ignored his complaints is a question of fact that cannot be decided at summary judgment. (*See* ECF No. 125 at PageID 3984.) For the reasons below, qualified immunity shields the Officers from this claim.

Excessive handcuffing claims come with their own unique standards. *See Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021) ("Conceptually, the handcuffing test is a subset of the general Fourth Amendment excessive-force framework." (citing *Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997)). In broad strokes, "[t]he Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Getz v. Swoap*, 833 F.3d 646, 654 (6th Cir. 2016) (quoting *Morrison*, 583 F.3d at 401 (6th Cir. 2009).

But rather than jump to the usual excessive-force framework to decide whether an officer violated this right, the Sixth Circuit employs a narrow three-part test. *Id.* "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer enough evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Morrison*, 583 F.3d at 401 (citing *Lyons*, 417 F.3d at 575–76. The parties only disagree on the second element—whether the Officers ignored Mr. Riggs's complaints—and so the Court focuses its analysis there.

### 1.    Initial Cuffing

In his Complaint, Mr. Riggs asserts that Officers Armstrong and Martin placed handcuffs on him "with great force and extreme tension and restriction." (ECF No. 1 at PageID 9.) The Court accepts that as true here. But the Sixth Circuit has "never held that an officer's failure to check for tightness or double lock handcuffs at the moment of arrest is, *per se*, excessive force."

*Getz*, 833 F.3d at 653 (citation omitted).  The analysis is instead always "fact specific and based on the totality of circumstances."  *Id.*

Given Mr. Riggs's "resistance and general noncompliance" during his initial detention, the Officers "did not violate the Fourth Amendment when [they] applied handcuffs."  *Id.* ("[E]ven assuming the handcuffs were tight enough to cause abrasions, or tightened at some point because of the failure to double lock, a failure to take such additional cautions, in the context of a struggling arrestee now only subdued and partially mollified, is understandable and not all conduct that causes an arrestee discomfort or pain violates the Fourth Amendment." (citing *Graham*, 490 U.S. at 396)).  Because Mr. Riggs resisted arrest and the Officers struggled to detain Mr. Riggs, the case law on the Fourth Amendment supports the Officers' actions in placing him in handcuffs and their alleged failure to keep the handcuffs comfortable.  As a result, the Officers did not violate his constitutional rights, and they are entitled to qualified immunity for this interaction.

### 2.      Prolonged Cuffing

The Court now turns to the heart of this claim—whether the Officers ignored Mr. Riggs's complaints.  The Officers maintain that they did not ignore Mr. Riggs because they responded to his complaints by "repeatedly check[ing] the cuffs."  (ECF No. 132 at PageID 4287, 4290–95.) And Mr. Riggs is not stating that the Officers *literally* ignored his complaints about the handcuffs.  Rather, he alleges that the Officers failed to "meaningfully address[]" them.  (ECF No. 125 at PageID 3984.)  Or as he puts it, "a jury could find [the] officers . . . did not meaningfully loosen or double-lock the handcuffs until well after Mr. Riggs experienced physical pain, swelling, and numbness in his wrists and arms."  (*Id.*)  So the question Mr. Riggs poses is

whether the law requires officers to "address" the handcuffs by loosening them when a detained person complains about how tight they are.

### *i.*      **Bodycam Footage**

Officers Armstrong and Martin handcuffed Mr. Riggs around 6:30 p.m.  (*See* ECF No. 126-1 at PageID 4005.)  And Leuitenant Holmes ordered the Officers to take his handcuffs off at 8:01 p.m. after Mr. Riggs said he could not breathe.  (Armstrong Video at 1:05:30.)  The Court now describes what the bodycam footage shows happened during the hour and a half Mr. Riggs was in handcuffs.

Mr. Riggs first complains about the handcuffs as Officers Armstrong, Martin, and Gomez-Marquez ask him to get into the squad car.  (Martin Video at 13:15–13:40.)  He complains about the left handcuff.  (*Id.*)  The video shows that Officer Martin then touches Mr. Riggs's wrists, and one can see part of his thumb pass through the left handcuff as he checks the tightness.  (*Id.*)

After struggling to get Mr. Riggs into the vehicle, Officer Gomez-Marquez then drives him to Lakeside.  Mr. Riggs is heard groaning as they drive off.  (Gomez-Marquez Video at 52:20–1:02:00.)  Officer Gomez-Marquez asks him "what's hurting."  (*Id.* at 1:02:11.)  Mr. Riggs says nothing about his wrist or handcuffs.  (*Id.*)  Officer Gomez-Marquez then directly asks whether his hands are hurting, and Mr. Riggs says "no."  (*Id.* at 1:03:22.)  Mr. Riggs goes silent after this, and Officer Gomez-Marquez pulls over to check on him.  (*Id.* at 1:08:43.)  He keeps driving once Mr. Riggs wakes back up.  (*Id.* at 1:10:00.)

They then pull into what looks like the Lakeside parking lot and Mr. Riggs asks to have his left arm let loose.  (*Id.* at 1:15:45.)  Officer Gomez-Marquez asks Officer Martin, "you said you loosened up his cuffs?"  (*Id.* at 1:16:00.)  Officer Martin responds that he did and says, "the

34

left one I could put a whole finger in if that is what he is complaining about." (*Id.* at 1:16:05.) The Officers did not re-check Mr. Riggs's handcuffs at that point. They waited on the parking lot with Mr. Riggs in the back seat until Lakeside let the Officers bring him inside.

After about thirty-five minutes, Officers Armstrong, Martin, and Gomez-Marquez walk Mr. Riggs to the Lakeside entrance.[16] (*Id.* at 1:46:00.) Lieutenant Holmes is there as well. (Armstrong Video at 40:15.) Although Mr. Riggs is not complaining about his wrists, he is groaning, and Officer Gomez-Marquez touches the right and left side of Mr. Riggs's handcuffs. (*Id.*) He does the same about a minute later once they all move into the waiting area. (*Id.* at 41:46.) And the video shows the Officer's fingers slide through Mr. Riggs's skin and the handcuffs on the right and left sides. (*Id.* at 41:50.) Officer Armstrong checks handcuffs as well. (*Id.* at 41:56.)

Still in the waiting area, Mr. Riggs asks the Officers to loosen the handcuffs. (*Id.* at 49:18.) Officers Gomez-Marquez and Martin both pull his handcuffs higher on his arms. (*Id.*) Mr. Riggs asks again. (*Id.* at 49:25.) And the Officers re-touch and re-check his handcuffs. (*Id.*) Officer Gomez-Marquez says that "they are just sitting kind of low" and comment on Mr. Riggs's elbow position. (*Id.* at 49:35–49:50.)

A Lakeside employee then lets them into the medical area. Officer Martin later asks an employee whether they can take the handcuffs off. (Martin Video at 2:30:00.) She replies "no" because they are waiting to give him medicine. (*Id.*; *see id.* 2:33:00.)

After Mr. Riggs has been seated and seen by Lakeside employees who examine him, he asks the Officers to adjust his arms so that the handcuffs can sit in front of him. (Armstrong

---

[16] All told, Mr. Riggs was in the back of Officer Gomez-Marquez's squad car for about fifty-five minutes. (*Id.* at 52:20–1:46:00.)

35

Video at 1:05:20–1:05:30.)  He then says, "this is killing me, I can't breathe." (*Id.* at 1:05:34.)

And Lieutenant Holmes immediately orders the Officers to take his handcuffs off. (*Id.*)  The

Officers then remove the handcuffs. (*Id.*)

### ii.      Did the Officers Ignore Mr. Riggs's Complaints?

With all this in mind, the question now becomes whether a reasonable jury could find that

the Officers violated Mr. Riggs's Fourth Amendment right by responding to his complaints by

checking—but not loosening or taking off—his handcuffs. *See Morrison*, 583 F.3d at 401 ("In

order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient

evidence to create a genuine issue of material fact that . . . the officer ignored [their]

complaints[.]" (citing *Lyons*, 417 F.3d at 575–76)).  An overview of the relevant caselaw

provides some guidance about whether factual questions remain and, if so, whether they preclude

summary judgment here.

Start with *Morrison*, a case in which conflicting testimony presented a question of fact.

The plaintiff complained that her handcuffs were too tight. *Id.* at 402.  And the officer claimed

he responded by "sticking his finger in between the handcuffs and [her] skin to make sure they

were not 'too tight.'" *Id.*  But the plaintiff told a different story.  She claimed that the officer

responded by saying that "he could place the handcuffs on 'as tight as he wanted to and that's

how they were staying.'" *Id.*  Another witness "similarly asserted" that the officer refused to

loosen the handcuffs. *Id.*  Given the conflicting testimony, the Sixth Circuit denied qualified

immunity because "a reasonable juror could conclude based on the evidence that [the officer]

ignored the complaints that the handcuffs were too tight." *Id.*

*Baynes* is a similar case.  799 F.3d at 609.  After the plaintiff complained about his

handcuffs, the officer simply replied, "that the handcuffs were not too tight, and if they were

loosened, [you] may be able to get out." *Id.* The Sixth Circuit categorized this as a "dismissive response." *Id.* It noted that such a response "is sufficient to meet the second prong of a claim for excessively forceful handcuffing; that is, a plaintiff can survive summary judgment even if the officer gave some reply to plaintiff's complaint if the response was essentially non-responsive." *Id.* (citing *Morrison*, 583 F.3d at 402). And that makes sense. To conclude the officer responded to the plaintiff's complaint and therefore did not ignore him, "[t]he jury would have to believe that the handcuffs in fact were not too tight." *Id.*; *see id.* ("Such a judgment is a credibility determination inappropriate for a court on summary judgment.").

And *Hughey* is another case in which a plaintiff survived summary judgment based on conflicting testimony. 3 F.4th at 290. The plaintiff there complained about her handcuffs. *Id.* And the officer told her that he would remove them once they arrived at a hospital. *Id.* The Sixth Circuit again categorized the officer's reply as "essentially non-responsive." *Id.* (citing *Baynes*, 799 F.3d at 609). Although the officer "swore that he checked the tightness of the handcuffs," the plaintiff testified that he did not do so. *Id.* at 290 n.6. So, faced with conflicting testimony, the court denied summary judgment to let a jury decide whose story was more believable. *Id.* at 290.

Each of these cases has conflicting testimony about whether an officer ever responded to a detainee's handcuffing complaints. But missing from these cases is any video footage showing an officer responding to a complaint by physically checking a detainee's handcuffs.[17] Also

---

[17] Neither party has pointed to a case in which a court analyzes an excessive-handcuffing claim with the aid of bodycam footage. But the Sixth Circuit got close in one unpublished decision. The panel in *Onwenu v. Bacigal* denied summary judgment to an officer, again, based on conflicting testimony. 841 F. App'x 800, 811 (6th Cir. 2021). The *Onwenu* court noted that the officer could "be seen on video crawling into the back of the patrol car and observing the handcuffs with his flashlight." *Id.* But the video did not show "whether or not the handcuffs were excessively tight when [the officer] declined to readjust them." *Id.* So the panel cited

missing is evidence that the handcuffs were loose enough for an officer to pass their fingers through—a practice the Sixth Circuit has found "ensure[s] proper spacing." *See Meadows v. Thomas*, 117 F. App'x 397, 405 (6th Cir. 2004).

The Officers here provided declarations explaining their version of events. (*See* ECF Nos. 109-4, 109-5, 109-6, 109-7.) Each Officer noted that they had been trained to handcuff a detainee behind the back. (*See* ECF No. 109-4 at PageID 3608.) That is because a detainee "could use handcuffs as a weapon to hurt [themselves], an officer, or others if the handcuffs are applied in the front rather than behind the back." (*Id.*) The Officers also stated that, based on their training, handcuffs are not too tight if an officer can "insert[] a thumb or finger between the individual's wrist or handcuff." (*Id.* at PageID 3609.)

Officers Armstrong and Martin described how they handcuffed Mr. Riggs. Officer Armstrong placed a handcuff on one wrist and Officer Martin placed a handcuff on the other. (*Id.* at PageID 3613; ECF No. 109-5 at PageID 3627–28.) Officer Martin then double locked the handcuffs.[18] (*See* ECF No. 109-4 at PageID 3613.) The Officers checked the handcuffs while Mr. Riggs was still on the ground and observed that "they were not too tight." (*Id.*)

After Officers Armstrong, Gomez-Marquez, and Martin brought Mr. Riggs back to the squad car, they all recall him asking them to undo his left handcuff. (ECF No. 109-4 at PageID 3614; ECF No. 109-5 at PageID 3629; ECF No. 109-6 at PageID 3641.) The Officers observed that the handcuffs were double locked "and not too tight." (*See* ECF No. 109-5 at PageID 3629.)

---

conflicting testimony—"[the plaintiff] [said] they were too tight; [the officer] [said] they were not"—as the reason for denying summary judgment. *Id.*

[18] As the Officers explain, "double locking handcuffs" prevents handcuffs from tightening any further. (*See* ECF No. 109-4 at PageID 3608.) *See also Getz*, 833 F.3d at 650 n.1 ("Double locking prevents the handcuffs from accidentally further tightening, which may happen if an arrestee struggles or adjusts his arm positioning.").

They also remember checking Mr. Riggs's handcuffs at other times throughout the evening. (*Id.* at PageID 3632.) The Officers observed that the handcuffs "were not too tight" and that at one point, the handcuffs "were loose enough to slip down to Mr. Riggs's wrist." (*Id.* at PageID 3632.)

But despite the conflicting framing of events here, the bodycam footage tells the story. So the Court need not accept either side's testimony about the events because it can see for itself. *Cf. Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The caselaw clearly establishes a right not to be ignored when one complains about handcuffs being too tight. So the question is whether the record supports a claim here that the Officers *ignored* Mr. Riggs's complaints. *See, e.g.*, *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) ("Our precedents allow the plaintiff to get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight."). Considering the record here, it cannot be said that the Officers ignored or were "essentially non-responsive" to his complaints. The video footage shows the Officers responding to Mr. Riggs's complaints not once, not twice, but many times through the night. It also shows the Officers passing their fingers through each handcuff at different times. Put simply, the video shows the Officers checking the tightness of the handcuffs in response to Mr. Riggs's complaints. Mr. Riggs's claim that the Officers "ignored" his complaints accordingly falls short.

But Mr. Riggs seems to suggest a step beyond "ignoring." He implies that the Officers must do more than checking handcuff tightness with the finger test recognized by at least one

Sixth Circuit panel.  Without citing any caselaw for his position, in effect, he argues that the

Officers must also *adjust* the handcuffs if a detainee complains about the tightness.  The Court

finds that such a requirement is not a right that is clearly established.  The law does not place a

reasonable officer on notice that when a detainee complains that the handcuffs are too tight, that

officer must make an adjustment to them despite finding the handcuffs are already loose.  *See*

*Getz*, 833 F.3d at 654 (assuming an excessive-handcuffing violation occurred and instructing

courts to "also ask whether the right was clearly established, that is, whether it would be clear to

a reasonable officer that his conduct was unlawful in the situation he confronted." (internal

quotations and citation omitted)).

That said, it is clearly established that the Fourth Amendment protects against excessive

handcuff tightening.  *See, e.g.*, *Baynes*, 799 F.3d at 613 (citing *Walton v. City of Southfield*, 995

F.3d 1331, 1342 (6th Cir. 1993)).  And courts deny summary judgment when there are factual

disputes about whether an officer was non-responsive or otherwise ignored a detainee's

complaints.  *See, e.g.*, *Burchett*, 310 F.3d at 944–45 ("Our precedents allow the plaintiff to get to

a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly

and ignored the plaintiff's pleas that the handcuffs were too tight." (citations omitted).  But where

there is no question about an officer's response or the evidence shows they did not ignore a

detainee, it follows that a court may enter summary judgment in their favor.  *See Lyons*, 417 F.3d

at 575 ("Not all allegations of tight handcuffing, however, amount to excessive force.").  Such is

the case here; the Officers are therefore entitled to qualified immunity.

### E.    Failure to Intervene

Next Mr. Riggs claims that the Officers failed to intervene to prevent their fellow officers

from inflicting excessive force.  A police officer that fails to prevent excessive force can be held

liable under § 1983 if "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 639–40 (6th Cir. 2013) (citation omitted). It follows that this claim fails if Mr. Riggs cannot prove an underlying excessive force violation for the Officers to intervene in. *See Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 615 (6th Cir. 2022) ("To succeed on a claim for failure to intervene, a plaintiff must show that there was an 'underlying constitutional violation.'" (quoting *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 413 (6th Cir. 2015)). As noted above, the Court finds that Mr. Riggs's claim that the Officers used excessive force when they placed him in custody fails. As a result, the Court grants summary judgment in the Officers' favor for this claim.

## III.    Failure to Render Medical Care

Mr. Riggs next alleges his injuries show that the Officers violated his Fourteenth Amendment right to "necessary" medical care. (ECF No. 1 at PageID 10, 12.) To be sure, after Lakeside transferred him to Baptist Hospital, doctors diagnosed Mr. Riggs with a moderately collapsed left lung and acute left rib fracture. (*See* ECF No. 127-1 at PageID 4035.) The Officers do not dispute this, but argue that they are entitled to summary judgment because Mr. Riggs's injuries were not obvious to them. (ECF No. 110-1 at PageID 3750.) Mr. Riggs counters that a jury could conclude otherwise. (ECF No. 125 at PageID 3997.) For the reasons below, the Court finds that the Officers are also entitled to summary judgment on this claim.

The Fourteenth Amendment's Due Process Clause requires law enforcement officers to provide medical care to persons "who have been injured while being apprehended." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). An officer violates this right by

41

acting with "deliberate indifference" to a detainee's "serious medical needs." *Greene*, 22 F.4th at 605.

To survive summary judgment on a deliberate indifference claim, a plaintiff must present evidence from which a reasonable jury could find for him on two separate elements. *See Mercer v. Athens Cnty., Ohio*, 72 F.4th 152, 160–61 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty. Tennessee*, 14 F.4th 585, 597 (6th Cir. 2021)). The first element requires a plaintiff to show that he had an "objectively serious medical need." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 317 (6th Cir. 2023) (citation modified) (quoting *Brawner*, 14 F.4th at 596). The second element is subjective, requiring that the officers "acted deliberately (not accidently), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (citation modified). In other words, "a pretrial detainee must have a serious medical need, and the defendant must act, whether through intentional action or omission, recklessly in response to the need and the risk it presented to the detainee." *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 405 (6th Cir. 2023) (citing *Helphenstine*, 60 F.4th at 317).

The Court's analysis begins and ends with the first element. "A serious medical need is one 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Greene*, 22 F.4th at 607 (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). "Obviousness" is a key factor here. *Hodges v. Abram*, 138 F.4th 980, 988 (6th Cir. 2025) (citing *Blackmore v. Kalamzoo Cnty.*, 390 F.3d 890, 897–99 (6th Cir. 2004)). Life-threatening physical injuries such as a gunshot wound are obvious. *See Heeter v. Bowers*, 99 F.4th 900, 916 (6th Cir. 2024). So are certain "external signs of internal distress," like "complain[ing] and vomiting." *Hodges*, 138 F.4th at 988 (citations omitted).

42

Mr. Riggs's cursory argument on this standard falls short.  He implies that his injuries were obvious because he was "visibly unresponsive and disoriented" in front of the Officers. (ECF No. 125 at PageID 3996.)  And so "[a] jury could conclude that [the] officers' failure to render or obtain aid was not merely negligent, but unconstitutional."  (*Id.* at PageID 3997.)

Yet the Sixth Circuit "has held that a medical need was not obvious, and hence not objectively serious, when it was not obvious to trained medical personnel." *Hodges*, 138 F.4th at 988 (6th Cir. 2025) (referring to and discussing *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009)).  That standard makes sense: a medical need is likely not obvious to a police officer if it is not obvious to a medical professional.  *See Spears*, 589 F.3d at 255 ("Therefore, plaintiffs have not established that McCargo's condition and need for medical attention, which was not obvious to trained medical personnel, would have been obvious to a layperson or to Officer Ruth—who was less able than EMTs to determine McCargo's medical needs."); *see also McGaw v. Sevier Cnty., Tennessee*, 715 F. App'x 495, 498 (6th Cir. 2017) ("The record does not show any evidence that the officers were or should have been aware that their lay understandings of this situation were superior to [a nurse's] trained assessment.").

The medical personnel at Lakeside examined Mr. Riggs before he was admitted.  His injuries were not obvious even to trained medical personnel at Lakeside.  In fact, the nurse practitioner that filled out Lakeside's medical screening form noted that Mr. Riggs did not "meet criteria for Emergent Medical Condition based on physical findings."  (ECF No. 112 at PageID 3757.)  The nurse practitioner also checked a box to "continue the assessment process" rather than "facilitate transfer to Medical Facility related to emergent physical condition."  (*Id.* at PageID 3758.)  But on the same form, the nurse practitioner  writes shortly after this that they are "request[ing] ER" because Mr. Riggs "reports pain in chest around heart."  (*Id.*)  And the

43

ambulance personnel that transferred Mr. Riggs to Baptist Hospital recorded "no obvious distress noted, no evidence of trauma noted." (ECF No. 113 at PageID 3787.)  This means that not only was Mr. Riggs's fractured rib and lung injury not obvious to a nurse practitioner, but that he showed no outward signs of trauma to other trained medical professionals.  Because Mr. Riggs has not established an objectively serious medical need that would have been obvious even to a lay person, the Court "need not addressed the subjective prong" of the deliberate-indifference analysis.  *See Hodges*, 138 F.4th at 991 (citing *Dodson v. Wilkinson*, 304 F. App'x 434, 439 (6th Cir. 2008)).

In what appears to be his second argument, Mr. Riggs summarily states that the Officers' "failure to provide medical care violated clearly established law." (*Id.* at PageID 3996.)  But he does not point the Court to any caselaw with similar facts or would have put the Officers on notice that taking him to Lakeside meant they failed to provide medical care.  Indeed, the cases he cites only deal with medical care once a detainee is already custodial or medical setting[19]— none show that officers detaining someone suffering from a mental health issue immediately need to seek medical treatment rather than taking the detainee to a mental health facility.  That is not enough.  *See Wiley*, 36 F.4th at 669 (finding that a plaintiff failed to meet their burden to

---

[19] Mr. Riggs cites *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834 (6th Cir. 2002) to argue that the Officers unconstitutionally chose to "wait and see" rather than "promptly escalate or seek alternative care from Mr. Riggs when it became clear that he would not be admitted to Lakeside immediately." (ECF No. 125 at PageID 3997.)  But the individual defendants in *Terrance* were doctors, a nurse, an EMS team, and an occupational therapist—not police officers responding to a mental health crisis.  286 F.3d at 844–47.  Mr. Riggs also cites *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004) and *Shadrick v. Hopkins County., Kentucky*, 805 F.3d 724 (6th Cir. 2015).  (ECF No. 125 at PageID 3996–97.)  Yet *Blackmore* denied qualified immunity to *jailers* who ignored the plaintiff for *two days* after he vomited and made "unrelenting complaints."  390 F.3d at 900.  And in *Shadrick*, the Sixth Circuit reversed a district court's grant of qualified immunity to a private, for-profit corporation that provided medical services to county inmates.  805 F.3d at 749.  The court reasoned qualified immunity did not extend to corporations with government contracts.  *Id.*  Neither of those facts applies here.

44

show a clearly established right because the three cases they relied on had no analogous facts).

Simply put, Mr. Riggs has not met his burden of showing the Officers violated clearly

established law. *See Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 993 (6th Cir.

2017) ("The Supreme Court recently reminded us that a plaintiff must identify a case with a

similar fact pattern that would have given 'fair and clear warning to officers' about what the law

requires." (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

In sum, Mr. Riggs has not shown that his medical needs were objectively serious—and

therefore obvious—to the Officers or trained medical personnel. Nor has he provided the Court

with any clearly established law that would support a constitutional violation on these facts. The

Court therefore finds that the Officers are entitled to qualified immunity for this claim.

## IV.    False Arrest and False Imprisonment

Mr. Riggs also brought state claims against the Officers for false arrest and false

imprisonment.[20]  (*See* 125 at PageID 399 (citing ECF No. 1 at ¶¶ 2, 50, 55, 95.)  These claims

share the same elements under Tennessee law,[21] requiring a plaintiff to prove "(1) the detention

or restrain of one against his will and (2) the unlawfulness of such detention of restraint." *Brown*

*v. Christian Bros. Univ.*, 428 S.W.3d 38 (Tenn. Ct. App. 2013) (quoting *Coffee v. Peterbilt of*

*Nashville, Inc.*, 795 S.W. 656, 659 (Tenn. 1990)).  An officer acting with probable cause negates

---

[20] The Officers also argue that the Complaint asserts these claims only against the City. (*Id.*)
Mr. Riggs argues that this is a "red herring" because the Complaint "alleges conduct giving rise
to false arrest and imprisonment" and they "have been on notice of these allegations throughout
the litigation." (ECF No. 125 at 3999.)  Perhaps that is true.  But the Court need not resolve this
dilemma—the state claims against the Officers fail on the merits.

[21] As the Sixth Circuit explained, "the claims of false arrest and imprisonment are the same
under Tennessee law when the alleged false imprisonment arises out of an alleged false arrest by
a law-enforcement officer." *Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020) (internal
quotation marks omitted) (citations omitted).

both.  *See id.* (citing *Brown v. SCOA Indus., Inc.*, 741 S.W.2d 916, 919–20 (Tenn. Ct. App. 1987)).

So not surprisingly, the Officers contend that these claims fail because they had probable cause to detain Mr. Riggs.  (ECF No. 110-1 at PageID 3750.)  Mr. Riggs disagrees, arguing that there are genuine disputes of material fact about whether probable cause existed under Tennessee law.  (ECF No. 125 at PageID 3998.)  But the Court has already found that the undisputed facts show that the Officers had probable cause for a mental health seizure here.  And the probable cause standard in the mental health seizure context under Tennessee law is the same as it is in federal law.  *See Reeners v. Troup*, No. 15-0625, 2020 WL 409746, at *16–17, 23–24 (M.D. Tenn. Jan. 23, 2020); *Hargis v. Overton Cnty.*, No. 22-0011, 2023 WL 7930045, at *19 (M.D. Tenn. Nov. 15, 2023).  Because the Officers had probable cause to detain Mr. Riggs for a mental health evaluation, these claims fail as a matter of law.

## V.      Conclusion for the Officers' Motion for Summary Judgment

In the end, it is Mr. Riggs's burden to show qualified immunity does not apply.  But he has not met that burden for the reasons above.  "The essence of qualified immunity . . . is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect ways." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  And that is especially true here, where the Officers reasonably responded to a mental health crisis and sought to get Mr. Riggs the help that he needed.

The Court therefore **GRANTS** the Officers' Motion for summary judgment and **DISMISSES** the claims against them.

**FINAL MATTERS**

Remaining still are the City's Motion for Summary Judgment (ECF No. 109), Plaintiffs'

Motions for Summary Judgment (ECF No. 95), and Mrs. Riggs's loss of consortium claim (ECF

No. 1 at PageID 18–19). The Court briefly addresses each.

**I.    The City's Motion**

Mr. Riggs sued the City under both § 1983 and the TGTLA.[22] (ECF No. 1 at PageID 13–

18.) Start with the federal statute. Section 1983 applies to municipalities like the City through

what is known as *Monell* liability. *See Monell v. Dept. of Soc. Servs,* 436 U.S. 658, 694 (1978).

To establish that liability, a plaintiff must show that a government official violated their

constitutional rights and that a municipality's policy or custom is responsible for that violation.

*See id.*; *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at

692).

Mr. Riggs alleges that the City failed to train the Officers and that its "customs, practices,

and policies" caused them to violate his constitutional rights. (*See* ECF No. 1 at PageID 15–17.)

The City asserts that Mr. Riggs has presented no evidence of an unconstitutional custom or

policy. (ECF No. 109-13 at PageID 3721–25; ECF No. 133.) Fair point—Mr. Riggs's

opposition to summary judgment in large part repackages his arguments about the Officer's

qualified immunity. (*See* ECF No. 124 at PageID 3952–55.) *See Connick v. Thompson*, 563 U.S.

51, 60 (2011) (explaining that local governments cannot be held liable under a respondeat

---

[22] The Complaint also names the Officers in their official capacities. (*See* ECF No. 1.) But when, as here, "the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted). So before moving on, the Court **DISMISSES** the official capacity claims. *See, e.g., Spencer v. City of Hendersonville*, 487 F. Supp. 3d 661, 675 (M.D. Tenn. 2020), *aff'd*, No. 20-6168, 2021 WL 8016828 (6th Cir. Oct. 8, 2021) (explaining that official-capacity claims are redundant).

superior theory because they are responsible only for "their *own* illegal acts") (quoting *Pembaur v. Cincinnati*, 475 U.S. 658, 692 (1978)).

But this claim fails because the City cannot be held liable for any wrongdoing under § 1983 because, as noted above, Mr. Riggs has not shown that the Officers violated his constitutional rights. *See Martinez v. Wayne Cnty., Michigan*, 142 F.4th 828, 844 (6th Cir. 2025) ("Regardless of the asserted theory, our precedent shows that '[t]here can be no liability under *Monell* without an underlying constitutional violation.'" (quoting *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023)); *id.* ("The lack of a clearly established constitutional violation alone 'spells the end [of the plaintiff's] *Monell* claim." (citing *Arrington-Bey*, 858 F.3d at 995)); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Foos v. City of Delaware*, 192 F. App'x 582, 592 (6th Cir. 2012) ("The absence of a constitutional violation also makes it unnecessary to address the issue of municipal liability under § 1983.").

The TGTLA "negligence and false imprisonment"[23] claim fares no better. (ECF No. 1 at PageID 18.) Acknowledging that the Court has no lingering federal matters to address, the City asks it to exercise supplemental jurisdiction over this claim given the late stage of litigation. (ECF No. 109-13 at PageID 3726.) *See* 28 U.S.C. § 1367. Mr. Riggs did not oppose this request and argues his claim on the merits. (*See* ECF No. 3955–58.)

---

[23] Curiously, Plaintiffs' response to the City's Motion now alleges "failure to provide medical care." (*See* ECF No. 124 at PageID 3957.) But that claim is nowhere in the Complaint itself. So to the extent that this is in fact a new claim, the Court need not entertain it at this late stage. *See, e.g.*, *Vaughn v. City of Lebanon*, 18 F. App'x 252 (6th Cir. 2001) ("Courts have routinely refused to consider claims that were not properly raised in a complaint[.]"); *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (explaining why a plaintiff cannot "raise a new claim in response to a summary judgment motion" (citations omitted)).

The Court would normally pause before continuing. When deciding to retain jurisdiction over state-law claims, district courts "consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity." *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Tennessee prefers handing TGTLA cases in its own courts, so comity favors declining jurisdiction here. *See Devereux v. Knox Cnty.*, 15 F.4th 388, 394 (6th Cir. 2021) (explaining that "the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction."); *see also Epperson v. City of Humboldt*, 140 F. Supp. 3d 676, 689 (W.D. Tenn. 2015) (collecting cases that show "district courts in Tennessee have regularly declined" jurisdiction over TGTLA claims without abusing discretion). Yet courts in the Sixth Circuit have still exercised jurisdiction over TGTLA claims. *See, e.g., Johnson v. City of Memphis*, 617 F.3d 864, 871–72 (6th Cir. 2010) (ruling on Plaintiff's TGTLA claims). Given that the City's request is unopposed, and the resources the parties have expended presenting and defending these claims is substantial, the Court finds that exercising supplemental jurisdiction here is warranted.

Moving on. Governmental entities in Tennessee, like the City, are typically immune from lawsuits. Tenn. Code § 29-20-101 *et seq.*; *see Davidson v. Lewis Bros. Bakery*, 227 S.W.3d 17, 19 (Tenn. 2007) (explaining that sovereign immunity applies to municipalities). But Tennessee waived immunity through the TGTLA "for injury proximately caused by a negligent act or omission." Tenn. Code Ann. § 29-20-205. Even still, that waiver is limited by statute and does not apply "if the injury arises out of . . . [f]alse imprisonment . . . false arrest . . . or civil rights." *Id.* at § 29-20-205(2). Since Mr. Riggs's false imprisonment claim falls into one of these named

49

exceptions, it fails as a matter of law.  *See, e.g.*, *McCutchen v. Tipton Cnty.*, 430 F. Supp. 2d 741 (W.D. Tenn. 2006) (dismissing TGTLA claim for "false arrest and imprisonment in violation of [the plaintiff's] civil rights" (citation omitted)).

Negligence claims, on the other hand, generally fall within the TGTLA's immunity waiver.  Tenn. Code Ann. § 29-20-205 ("Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment," subject to numbered exceptions.)  That is unless the negligence claim "arises out of" conduct excluded by the statute.  *See Lawson v. Hawkins Cnty.*, 661 S.W.3d 54, 60 (Tenn. 2023) ("If the injury at issue 'arises out of' one of the acts specified in Tennessee Code Annotated section 29-20-205(1)–(9), then immunity still holds.").  The TGTLA civil rights exception for § 1983 claims is one such exclusion for which immunity "still holds."  Tenn. Code Ann. § 29-20-205(2); *see Johnson*, 617 F.3d at 872 ("TGTLA's "civil rights" exception has been construed to include claims arising under 42 U.S.C. § 1983 and the United States Constitution." (citation omitted)).  Because Mr. Riggs bases his negligence claim on the § 1983 claims already alleged in his Complaint (*see* ECF No. 1 at PageID 18–19 (realleging that "[s]aid actions [in the Complaint] amounted to negligence")), the City is immune.  *See, e.g.*, *Johnson*, 617 F.3d at 872 (concluding same).

The Court therefore **GRANTS** the City's Motion for Summary Judgment and **DISMISSES** the claims against it.  And with no further claims remaining, the Court **DENIES** Plaintiffs' Motion for Summary Judgment **AS MOOT**.

## II.    Loss of Consortium

That leaves Mrs. Riggs.  She sued Defendants for the damage to her relationship caused by "the injuries and damages sustained and incurred" by her husband, otherwise known as loss of consortium.  (ECF No. 1 at PageID 18.)

This claim quickly loses steam under both § 1983 and Tennessee state law.  Section 1983 "provides no relief for injuries collateral to the violation of another person's constitutional right." *LeFever v. Ferguson*, 645 F. App'x 438, 448 (6th Cir. 2016) (citation omitted).  Which means that—even on an otherwise successful § 1983 claim—there is no cause of action for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Foos*, 492 F. App'x at 593 (citation omitted).  And so Mrs. Riggs's loss of consortium claim fails under this statute.

Now to state law.  In Tennessee, loss of consortium is a derivative claim.  *See Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000); *see also* Tenn. Code Ann. § 25-1-106. "Derivative" means that the claim originates from someone else's injury.  *Hunley v. Silver Furniture Mfg. Co.*, 38 S.W.3d 555, 557 (Tenn. 2001) (citation omitted).  So when the underlying claim fails, the loss of consortium fails as well.  *See, e.g.*, *Maggard v. Nyrstar Tennessee Mines*, 634 F. Supp. 3d 454, 464 (E.D. Tenn. 2022) (citing *Waterhouse v. Tenn. Valley Auth.*, 475 F. Sipp. 3d 817, 827–28 (E.D. Tenn. 2020)).  Because Mr. Riggs has no remaining claims in this case, it follows that Mrs. Riggs cannot recover damages based on his alleged injuries.

## CONCLUSION

For the reasons above, the Court **GRANTS** the Officers' Motion for Summary Judgment and **GRANTS** the City's Motion for Summary Judgment.  Because Plaintiffs have no surviving

51

claims, the Court **DENIES** their Motion for Summary Judgment **AS MOOT** and **DISMISSES**

this case **WITH PREJUDICE**.

      **SO ORDERED**, this 31st day of March, 2026.

                                     s/ Thomas L. Parker
                                     THOMAS L. PARKER
                                     UNITED STATES DISTRICT JUDGE